SHONDA K. MILLION,

     Plaintiff,

                             **Case No. 1:16-cv-746**

   v.                     **JUDGE DOUGLAS R. COLE**

WARREN COUNTY, OHIO,

     Defendant.

## OPINION AND ORDER

This employment discrimination and retaliatory discharge case comes before the Court on Defendant Warren County's Motion for Summary Judgment. (Doc. 32). For the reasons discussed more fully below, the Court **GRANTS** Warren County's Motion for Summary Judgment (Doc. 32) and **DISMISSES WITH PREJUDICE** Plaintiff Shonda K. Million's ("Million") claims against Warren County.

## UNDISPUTED FACTS

Million was employed as a corrections officer at the Warren County Jail ("Warren County" or the "Jail") from September 26, 2006 until she submitted her resignation on December 28, 2015, and completed her last day of work on January 8, 2016. (Million Dep. at 25, 31, 37, Doc. 34, #249, 255, 261).

### A.    Background Information Of The Warren County Jail.

Warren County operates and administers the Warren County Jail through its Sheriff's Office. (Sims Aff. at ¶ 4, Doc. 32-8, #214). The Jail is an adult detention center for minimum-, medium-, and maximum-security inmates. It houses both male

and female inmates. (*Id.*). The Warren County Jail can house 224 male inmates, who are each assigned to one of four "pods," or housing units: A-Pod, B-Pod, D-Pod, and F-Pod. (Million Decl. at ¶ 2, Doc. 38-2, #798). In addition, the Warren County Jail can house 66 female inmates, all of whom are assigned to C-Pod. (Sims Aff. at ¶ 4, #214). The responsibilities of corrections officers at the Warren County Jail, whether male or female, are essentially the same. (Million Dep. at 37–38, #261–62). They include monitoring and logging inmates' daily activities, processing inmates entering and exiting the facility, completing security checks, and recording inmates' fingerprints. (*Id.*).

C-Pod consists of two common areas, each of which has two floors. (Million Decl. at ¶ 3, #798). In total, C-Pod contains roughly 30 cells. (*Id.* at ¶ 6). There is a glass control booth between C-Pod's two common areas. (*Id.* at ¶ 4). For each shift assignment at C-Pod, there are two posts for corrections officers: one "rover" officer in the common areas and one control booth attendant. (Sims Aff. at ¶¶ 6, 7, #214). The corrections officer assigned to the control booth can observe the female inmates in the C-Pod common areas and in some of the cells. (Million Decl. at ¶ 4, #798). Warren County assigns both male and female correction officers to monitor the control booth. (*Id.* at ¶¶ 4, 5).

Every pod, including C-Pod, has a "rover." The "rovers" are correctional officers assigned to "make rounds" in the pod. In the C-Pod, the rover's rounds cover both floors of C-Pod's two common areas. (*Id.* at ¶¶ 6, 7). The C-Pod rover observes the female prisoners whenever they have access to the common areas, e.g., during

prisoners' meals and other activities. (*Id.*). Female prisoners in C-Pod can access the common areas up to ten hours per day. (*Id.* at ¶ 10, #799). The rover in a pod also delivers food to inmates, collects and returns their laundry, delivers their mail, and handles their medications. (*Id.* at ¶ 7, #798). Every 59 minutes, the rover must perform a visual security check of the inmates in the rover's assigned pod. (Million Dep. at 43–44, #267–68). The assignment to act as the rover is rotated among corrections officers daily. (Sims Aff. at ¶ 14, #215). In other words, the rover for a given pod is not a separate position held by a single person, but rather is an assignment that a given corrections officer has for a particular shift. (*Id.*). And these rotating daily task assignments do not affect corrections officers' promotional opportunities, pay, benefits, or seniority. (*Id.* at ¶ 15).

According to Warren County policy, the rover position in the female housing units (i.e., C-Pod) must be assigned each shift to a female corrections officer to allow monitoring of female inmates while they are showering or in the toilet area. (*Id.* at ¶ 16). Under Jail policy, for privacy and safety reasons, a male corrections officer cannot observe female inmates disrobe. (Sims Aff. at ¶ 18, #215). To meet this staffing requirement, the Jail has a policy requiring that at least two female corrections officers work each shift, one of whom is assigned rover duties in C-Pod. (*Id.* at ¶ 7, #214). (The reason that it is two female corrections officers, rather than one, is addressed further below.) In the Sheriff's view, the absence of a female rover in C-Pod would create safety and security risks for the inmates because male corrections

officers (even when roving) cannot go beyond artificial barriers, like shower curtains or toilet stall walls, without first announcing their intent to do so. (*Id.* at ¶ 19, #215).

There is another position in the Jail that likewise has duties that the Sheriff concludes must be performed by female corrections officers. In particular, whenever a female prisoner arrives at the Jail, a female corrections officer who is not assigned as a rover proceeds to the Jail's booking area, where incoming inmates are processed, showered, and, in some instances, strip-searched. (*Id.* at ¶ 7, #214; Million Dep. at 43–44, #267–68). The booking process can be performed by any corrections officer, regardless of gender. (Million Decl. at ¶ 12, #799). But only a female corrections officer can conduct the shower in and out process of a female inmate. (Sims Aff. ¶ 9, #214). When the female corrections officer responsible for the showering process is assigned to a post other than the booking area, female inmates must wait in a holding cell until that female correction officer arrives. (Million Decl. at ¶ 12, #799). Then, the female inmate is "escorted to a room where they must remove all their clothing and are subject to an aggressive visual observation." (Sims Aff. at ¶ 10, #214). For privacy reasons, "[t]he shower in/out process of female inmates is monitored by a female corrections officer," and "[t]he shower-in/out process of a male inmate is monitored by a male corrections officer." (*Id.* at ¶ 9).

Moreover, some inmates are strip-searched during the intake process. For the safety and protection of both the corrections officers performing a strip search (and the inmate being searched), two corrections officers perform each strip search, and

those officers must be of the same sex as the inmate on whom the strip search is performed. (Sims Aff. at ¶ 13, #215).

**B. Million Raises Concerns Over The Jail's Employment Practices.**

For corrections officers at the Warren County Jail, there are three shifts (or "watches"): First Watch (midnight to 8:00 a.m.), Second Watch (8:00 a.m. to 4:00 p.m.), and Third Watch (4:00 p.m. to midnight). (Million Dep. at 40, #264). Corrections officers work five watches per week, and are off two watches per week. (Riley Aff. at ¶ 14, Doc. 32-3, #182). Corrections officers' shifts are determined every six months through a shift-bidding process. (Million Dep. at 153, #379). The officers "bid" for shifts based on seniority. (*Id.* at 39–40, #263–64). Given the number of female officers working at the jail, and to allow for minimum staffing (thereby reducing payroll costs), the available positions for females are divided equally among the three shifts. (Sims Aff. at ¶ 16, #217). The pay, seniority, benefits, and responsibilities of a corrections officer are not affected by the shifts or days of the week that the officer works. (Riley Aff. at ¶ 15, #183). Except for when Million worked the First Watch from June 30, 2012, through December 14, 2012, Million always successfully bid for her preferred shift throughout the ten years that she worked at the Jail. (Million Dep. Exs. A-19–A-25, #643–85).

When a corrections officer works more than eight hours in any calendar day, or more than 160 hours within a 28-day period, the Warren County Jail compensates that corrections officer with either overtime pay or compensatory time, at the election of the employee, as set forth in a collective bargaining agreement. (Sims Aff. at ¶ 21,

#216; Riley Aff. at ¶ 15, #182). The Warren County Jail requires female corrections officers to work overtime "on those rare occasions when staffing [fell] short due to unexpected absences of corrections officers [thereby] reducing the number of female corrections officers to [less than] two [per] shift." (Sims Aff. at ¶ 20, #215). The Jail also forces male corrections officers to work overtime, and the Jail uses female-only overtime sparingly and only as a last resort. (Riley Aff. at ¶ 16, #183). During Million's employment, the Warren County Jail rarely used female-only overtime, amounting to less than 5% of all overtime. (*Id.*).

During her tenure, Million can show she was forced to work female-only overtime on only two occasions: May 2, 2013, and May 21, 2013. (Million Dep. at 47, 59–60, 65–66, #271, 283–84, 289–90; Dep. Ex. A-10 at ¶ 10, #517; Dep. Ex. A-12 at ¶ 3, #528). On both occasions, the Warren County Jail compensated Million for her forced overtime, either through overtime pay or compensatory time. (Riley Aff. at ¶ 17, #183). Promotional opportunities or seniority of corrections officers at the Warren County Jail were never affected by overtime. (Sims Aff. at ¶ 23, #216).

In 2012, Million filed a grievance with the Jail, alleging that its employment practices impermissibly discriminated on the basis of sex. (Million Decl. at ¶ 22, #800). On July 26, 2013, Million filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") alleging that the Warren County's Sherriff's Office discriminated against female corrections officers. (*Id.* at ¶ 23).

## C. The Jail Disciplines Million.

Warren County has rules regarding employee conduct, which corrections officers are expected to follow. (Million Dep. at 88, #312). A disciplinary system exists to enforce the rules and regulations. (*Id.* at 88–89, 95, #312–13, 319; Dep. Exs. A-6, A-7, #567–623; Riley Aff. at ¶ 19, #184).

On March 20, 2014, Million failed to report for her scheduled shift at the Warren County Jail. (Million Dep. at 132–35, #356–59; Dep. Ex. A-13, #631–34). When a supervisor called Million to learn why she had not reported to work, Million said she had forgotten the shift. Million noted that she had been consuming alcoholic beverages and was unavailable to report for duty (per a Jail policy that prohibits corrections officers from drinking alcohol fewer than six hours before a shift begins). (*Id.* at 124–25, #348–49). Her failure to report for the shift forced another corrections officer to cover for her absence. (*Id.*). Not surprisingly, this absence violated the Jail's rule regarding absenteeism and reporting for duty. (*Id.*). On March 24, 2014, the Jail issued a written reprimand to Million for her failure to report for her scheduled shift on March 20, 2014. (*Id.* at 125, #349; Dep. Ex. A-13, #631–34). Million did not appeal or otherwise challenge the reprimand through the grievance procedures in the collective bargaining agreement ("CBA"). (*Id.* at 125, #349).

To allow her to perform certain duties, the Jail granted internet access privileges to Million. (Riley Aff. at ¶ 21, #184). In early 2014, an audit revealed her excessive use of the internet for personal reasons over an extended period of time and during work hours. (*Id.*). Million's actions violated the Jail's rule regarding unsatisfactory performance—specifically as to use of Sheriff's Office equipment. (*Id.*;

Million Dep. Ex. A-15, #636). At the time of this violation, Million had already been verbally reprimanded for unsatisfactory performance on April 11, 2014, after she failed to complete a round of monitoring within 59 minutes, as required by Jail policy. (Million Dep. at 128–29, #352–53; Dep. Ex. A-14, #635). Based on the audit results, the Jail issued another written reprimand for excessive personal use of the internet to Million on April 16, 2014, which she did not appeal or otherwise challenge through the grievance procedures in the CBA. (*Id.* at 130–31, #354–55; Dep. Ex. A-15, #636).

Then, from October to December 2014, the Warren County Jail conducted two separate reviews of Million's sick leave usage. (*Id.* at 106–07, #330–31; Dep. Exs. A-8–A-10, #624–26). The rules and regulations of the Warren County Sheriff's Office require sick leave reviews after an employee's fifth unscheduled absence within a twelve-month rolling period and after "[e]ach subsequent unscheduled occurrence [over] the next rolling calendar year." (Million Dep. at 105, 108, #329, #332; Riley Aff. at ¶ 18, #183). Million had six unscheduled sick days between November 24, 2013, and November 23, 2014. (Million Dep. at 111, #335). Neither the October 2014 nor November/December 2014 sick leave reviews resulted in any discipline to Million. (Million Dep. at 107, 109–10, #331, 333–34; Dep. Exs. A-8–A-10, #624–26). Although an administrative investigation occurred, and a pre-disciplinary hearing was held (arising from the November/December 2014 sick leave review), the Jail did not levy any violations against Million. (Million Dep. at 115, #339; Dep. Ex. A-11, #627–29).

On February 17, 2015, Million received a one-day suspension without pay when she failed to arrange coverage for the entirety of an assigned shift on December

6, 2014. (She had arranged for two separate officers to each cover half of her shift, but she incorrectly arranged for both of the officers to appear for the same half-shift, leaving no coverage for the other half-shift.) (Million Dep. at 132–35, #356–59; Dep. Ex. A-16, #637). In doing so, Million once again violated Warren County's rule against absenteeism and reporting to duty. (*Id.*). Million agrees that discipline was warranted for this violation. (Million Dep. at 133, #357). At the time she failed to arrange coverage for her shift on December 6, 2014, Million was "on active discipline," i.e., the Jail had issued a written reprimand to Million on March 24, 2014, for another violation regarding absenteeism/failing to report. (Million Dep. at 122–23, #346–47; Dep. Ex. A-13, #631–34). Since Million was on active discipline when she committed the December violation, the Jail suspended her for one day. (Riley Aff. at ¶ 22, #184).

## D. Warren County Rejects Million's Renewal Application.

The Warren County Jail has implemented a "field training program," which allows veteran corrections officers, designated as Field Training Officers ("FTOs"), to train new corrections officers. (Million Dep. at 136, #360). To serve as an FTO, the Jail requires corrections officers to apply for the position each year. (*Id.* at 137, #361). The Jail's policy lists other restrictions and requirements for FTOs. For example, all "[a]ctive FTOs must apply for renewal of this status every time a selection process is held." (*Id.* at 137–38, #361–62; Dep. Ex. A-17, #638–41). And, notably, the policy does not guarantee renewal of an officer's FTO designation. (Million Dep. at 138, #362). But the policy does explain to candidates that the "[e]ssential criteria to consider for

a field training officer applicant includes: job performance, discipline, attendance, leadership ability and attitude." (Million Dep. Ex. A-17, #638–41).

Million had served as an FTO for multiple years when she applied for renewal of those duties in June 2015. (Million Dep. at 136, 150–51, #360, 374–75; Dep. Ex. A-18, #642). In July 2015, however, the Jail rejected Million's FTO renewal application because she was "on active discipline" at or above a severity level of "suspension." (Million Dep. at 136, 138–40, #360, 362–64; Dep. Ex. A-16, #637). Around that time, the Jail also rejected the FTO renewal application of a male corrections officer, Andrew Ritter, for the same reason. (Def.'s Answers to Pl.'s Interrog. at ¶¶ 3–5, Doc. 32-9, #219–20).

### E.    Million Takes FMLA Leave.

Throughout her employment at the Jail, Million was granted all the (physician-authorized) FMLA leave requests that she submitted. (Million Dep. at 255, #479). In November 2015, Million requested, and the Jail granted, FMLA leave due to surgery she received on her left knee. (Million Dep. at 86, 218, 221, #310, 442, 445). Dr. Paley performed the surgery and initially certified consecutive FMLA leave from November 11, 2015, until December 15, 2015. (Million Dep. at 219–20, #443–44; Dep. Exs. A-29, A-30, #706–10). After Dr. Paley certified additional leave, Million requested (and the Jail granted) an extension of Million's FMLA leave, which allowed her to be off work from December 15, 2015, through December 20, 2015, and to return without restriction on December 21, 2015. (Million Dep. at 223, #447; Dep. Ex. A-31, #711).

On December 21, 2015, Million again sought to extend her FMLA leave. (*Id.* at 225, #449). That day, however, Dr. Paley authorized Million to immediately return to work on light duty and to remain on light duty until her next appointment on December 24, 2015. (Million Dep. at 226, #450; Dep. Ex. A-32, #712).

Transitional duty (previously known as "light duty") was available in December 2015 for corrections officers working at the Warren County Jail who were physically unable to work their normal duty assignment and were under a physician's care or order. (Hayes Aff. at ¶ 2, Doc. 32-6, #208). A physician's signature on a transitional duty request is required to be eligible for a transitional duty position. (*Id.*). Both Million and Dr. Paley signed a transitional duty request, which allowed Million to return to work in a transitional duty capacity on December 22, 2015, with an estimated return to full-duty work on December 29, 2015. (*Id.*). From December 22nd to 25th, that was the only paperwork that the Jail possessed. (Million Dep. at 225, #449).

Based on its policy, the Jail will not grant FMLA leave unless the employee seeking leave submits the proper paperwork, including a doctor's certification. (Million Dep. at 94, 219, 231, 255–56, #318, 443, 455, 479–80). Consistent with the transitional duty request described above, on December 23, 2015, Million was scheduled for light-duty work as a corrections officer at the Jail, beginning at 4:00 a.m. (Million Dep. at 243, #467; Richardson Aff. at ¶ 4, Doc. 32-2, #178). On December 22, 2015, Million's supervisor, Major Brett Richardson, informed Million that, because Dr. Paley had released her to return to work in a light-duty capacity, she was

expected to report for her scheduled shift on December 23, 2015. (Richardson Aff. at ¶ 5, #179). During the conversation, Million told Major Richardson that her schedule did not permit her to work on December 23rd, and she planned to return to work on December 24th. (*Id.*).

Million did not report to work on December 23, 2015. (Million Dep. at 243, #467). Instead, at approximately 9:00 p.m. on December 22, 2015, Million called in sick. (*Id.* at 243–44, #467–68; Richardson Aff. at ¶ 6, #179). Her supervisor, Major Richardson, attempted to call Million at her residence to determine her absence. (Richardson Aff. at ¶ 6, #179). Million did not answer the phone. (*Id.*).

Warren County's leave policy provides that "[a]n employee calling in sick or on scheduled sick leave is expected to remain at their residence, except to visit a clinic, hospital, personal physician, drug store, or other health care related site; or otherwise approved by their supervisor, during the time which they called in sick. If the employee is not found at the listed locations during the call-in period or without supervisor approval, there will be an immediate investigation." (Def.'s Mot. Summ. J., Ex. C1 at 2–3, Doc. 32-4, #188–89). This policy language was also in effect in December 2015. (Riley Aff. at ¶ 18, #183).

When Million did not answer Major Richardson's call, Chief Deputy Barry Riley sent two officers to Million's residence to verify that she was at home, as required by the sick leave policy and due to her "suspicious" comments to Major Richardson earlier that day. (Richardson Aff. at ¶ 7, #179; Riley Aff. at ¶ 23, #184). No one answered the door at Million's residence. (Richardson Aff. at ¶ 8, #179; Riley

Aff. ¶ 24, #184). Sergeant Nick Lamb then left a voicemail message for Million, ordering her to call Major Richardson at 8 a.m. (Richardson Aff. at ¶ 8, #179; Riley Aff. at ¶ 24, #184). Million received and listened to the voicemail message before 8:00 a.m., but did not call Major Richardson. (Million Dep. at 246–47, 249, #470–71, 473; Richardson Aff. at ¶ 8, #179). She admits this alone could have warranted discipline. (Million Dep. at 246–47, 249, #470–71, 473).

Warren County then initiated an administrative investigation into the circumstances of Million's absence from her scheduled shift on December 23, 2015, but Warren County did not discipline Million. (Million Dep. at 260, #484; Dep. Ex. A-36, #716–19; Riley Aff. at ¶ 25, #185). At some point shortly after December 24, 2015, Million provided to the Jail a new transitional duty request signed by her and Dr. Paley, which allowed Million to return to work in a light-duty capacity, beginning on December 24, 2015, and estimated that she could return to full-duty work on February 1, 2016. (Million Dep. at 253, #477; Dep. Ex. A-34, #714).

The Jail retroactively granted FMLA leave to Million for her absence on December 23, 2015, after she provided proper documentation from Dr. Paley. (Million Dep. at 255–56, #479–80; Richardson Aff. at ¶ 9, #179; Riley Aff. at ¶ 26, #185). After her FMLA leave in December 2015, Million returned to work as a corrections officer at the Jail, where she continued working the shift she had selected, and earning the same rate of pay. (Richardson Aff. at ¶ 11, #179; Million Dep. at 225–26, #449–50). Million's job responsibilities were reduced temporarily after returning to work in December 2015, but only upon the requests of Million and Dr. Paley that she perform

light-duty work. (Million Dep. at 225–26, #449–50; Dep. Ex. A-34, #714; Def.'s Mot. for Summ. J., Ex. D1, Doc. 32-7, #210–11; Richardson Aff. at ¶ 11, #179).

## THE PENDING MOTION

In her complaint, Million asserts three claims against Warren County: (i) sex discrimination in violation of 42 U.S.C. § 2000e-2 and Ohio Revised Code § 4112.02(A); (ii) retaliation in violation of Ohio Revised Code § 4112.02(I); and (3) retaliation in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* (*See* Pl.'s Am. Compl., Doc. 28, #120–25). In its pending motion, Warren County now moves for summary judgment on all of these claims.

## LAW & ANALYSIS

### A.      Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing that there are no genuine disputes of material fact, which the movant may do by demonstrating that the non-moving party lacks evidence to support an essential element of her claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response to the movant's showing, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). In other words, the existence of a "mere scintilla of

evidence" in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). That being said, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Finally, in conducting the summary judgment analysis, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the non-moving party and must refrain from making credibility determinations or weighing evidence).

**B.  Analysis Of Warren County's Motion For Summary Judgment.**

In its Summary Judgment Motion, Warren County claims the undisputed facts show that Million cannot prevail on any of her four claims. As to her sex discrimination claims, the County contends that Million cannot show she suffered any adverse employment action, which the County argues is a necessary element of her claim. Separately, the County argues that the gender-based policy that the County employs as to corrections officers is reasonable and necessary given the

exigencies of the prison environment. In that regard, the County claims both that (1) a BFOQ analysis is not necessary, and (2) in any event, the Jail can satisfy the BFOQ framework here. As to the various retaliation claims, the County argues that the undisputed facts show that Million did not suffer an adverse employment action for engaging in the allegedly protected conduct on which she bases her retaliation claims. While she did suffer certain job discipline, the County claims that the undisputed facts show that the discipline she received was warranted by misconduct in which she admits she engaged, and that she has failed to show that she would have received any different treatment if she had not engaged in the protected activity that she claims underlies the retaliation claim (e.g., reporting her concerns to the EEOC). The Court addresses each of the separate claims in turn.

1. **Million's Sex Discrimination Claim.**

    a. **Warren County's Policies Expressly Differentiate Among Corrections Officers Based On Sex, And Thus The County Must Show That It Satisfies The BFOQ Test.**

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee with respect to her terms, conditions, or privileges of employment, because of the employee's sex. 42 U.S.C. § 2000e–2(a)(1).[1] Million claims Warren County subjected her to terms and conditions of employment regarding shift bidding policies, overtime, and leave that were different from those

---

[1] The elements of a gender discrimination claim under Title VII and Ohio Rev. Code § 4112.02(A) are the same. *See Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 175 (2000) ("federal case law interpreting Title VII . . . is generally applicable to cases involving alleged violation of [Ohio Rev. Code §] 4112.").

that applied to men. (*See* Pl.'s Am. Compl. at ¶ 8, #122). Warren County admits that the Jail has adopted a facially discriminatory staffing plan that requires at least two female corrections officers to work during each shift, each day, and that the County thus necessarily takes a corrections officer's gender into account in the shift-bidding process, job-assignment process, and forced-overtime setting. (Def.'s Ans. at ¶ 5, Doc. 29, #127).

Where a plaintiff has submitted a defendant's facially discriminatory policy, the plaintiff has provided direct evidence of discrimination that violates Title VII's prohibition against disparate treatment. Warren County concedes that point but argues Million must still prove that she suffered an adverse employment action in order to have a viable claim. Under *Everson*, however, when an employer makes open and explicit use of gender a relevant characteristic for job-related purposes, as is the case here, disparate treatment is effectively "admitted" by the employer. *Everson v. Michigan Dep't of Corr.*, 391 F.3d 737, 747 (6th Cir. 2004); *but see Litton v. Talawanda Sch. Dist.*, 485 F. App'x 804, 812 (6th Cir. 2012) (Batchelder, J., dissenting). Thus, in that setting, an employee need not show a particular "adverse action." Rather, the sole remaining issue becomes "whether such overt disparate treatment is for some reason justified under Title VII." *Everson*, 391 F.3d at 747 (quoting *Reed v. Cnty. of Casey*, 184 F.3d 597, 599 (6th Cir. 1999)). In particular, while Title VII generally prevents overt discrimination, a narrow exception exists if the disparate treatment results from a bona fide occupational qualification (BFOQ). *Id.*

Warren County first argues, however, that it need not show that its gender-based policy qualifies as a BFOQ. In particular, it points to two Eighth Circuit decisions, *Tipler v. Douglas Cnty.*, 482 F.3d 1023, 1025 (8th Cir. 2007), and *Tharp v. Iowa Dep't of Corr.*, 68 F.3d 223, 225–27 (8th Cir. 1995), *cert. denied*, 517 U.S. 1135. Warren County claims that *Tharp* and *Tipler* stand for the proposition that a BFOQ analysis is unnecessary for gender-based policies in prisons, if (1) the policy requiring same-sex supervision of inmates is reasonable, and (2) the policy imposes only a "minimal restriction" on the employee. *See Tipler*, 482 F.3d at 1025; *Tharp*, 68 F.3d at 225–27.

The problem with that argument is, as Million correctly observes, the Sixth Circuit has not adopted the Eighth (or Ninth) Circuit's approach under which prisons need not meet the BFOQ framework to justify gender-based policies. *See id.*; *see also Robino v. Iranon*, 145 F.3d 1109, 1110 (9th Cir. 1998) (adopting the *Tharp* test). To be sure, in *Everson*, the Sixth Circuit acknowledged the deference that courts owe to prison officials, citing *Tharp*. *See Everson*, 391 F.3d at 750. But after finding that the Michigan prison's policy there amounted to overt disparate treatment, the *Everson* court applied that deference *to the BFOQ analysis*. In other words, while *Tipler* and *Tharp* found that the deference owed to prison officials precludes the need for a BFOQ analysis at all, *Everson* instead teaches that a BFOQ analysis continues to apply but presents a lower hurdle in the prison setting than it would elsewhere.

*Everson* is binding precedent on this Court. It also makes sense. *Everson's* approach reflects the notion, also apparent in other areas of the law, that the same

analytical labels typically apply in prison as elsewhere, but the analysis underlying those labels may differ to take account of the unique prison environment. In *Cutter v. Wilkerson*, 544 U.S. 709 (2005), for example, the Supreme Court noted that RLUIPA's "compelling governmental interest standard" still applied, but that "context matters in the application of that standard." *Id.* at 723 (quotation omitted). In particular, Congress intended courts to apply the standard with "due deference to the experience and expertise of prison and jail administrators." *Id.* (quoting S. Rep. No. 102-111, at 10. U.S.C.C.A.N. 1993, pp. 1892, 1899, 1900) (internal quotation omitted)); *see also Hoevenaar v. Lazaroff*, 422 F.3d 366 (6th Cir. 2006) (reversing district court in RLUIPA matter for failing to give proper deference to prison officials). Nor is such deference limited to RLUIPA matters. *See, e.g., Bazzetta v. McGinnis*, 124 F.3d 774 (6th Cir. 1997) (noting in a § 1983 action that "problems of prison administration are peculiarly for resolution by prison authorities and their resolution should be accorded deference by the courts"); *Bills v. Klee*, No. 15-cv-11414, 2020 WL 702805 (E.D. Mich. Feb. 12, 2020) (applying *Bazzetta*).

Nor is it at all surprising that courts have concluded that deference to prison administrators is warranted in many contexts. As the Sixth Circuit noted in *Everson*, "courts defer to the judgments of prison administrators not simply because of their expertise[,]" but also due to "the ability of administrators to plan and muster resources, the primary nature of the executive—as opposed to the judicial—branch of government to run the prisons, and the respect owed to state sovereignty by the federal judiciary." *Everson*, 391 F.3d at 752 (citing *Turner v. Safley*, 482 U.S. 78, 85

(1987)). As there is no doubt that prison officials often deal with dangerous and unique settings, an approach under which judges freely substitute their own views of "reasonableness" for that of prison officials not only invites misguided policy changes, but also may exacerbate dangers to inmates or prison staff. That is not to say that judges can never intercede in the prison environment, but it is to suggest that judges should be careful in doing so, and confirms that *Everson* was wise to make the BFOQ analysis more deferential in the prison setting than elsewhere.

In short, the Court rejects Warren County's argument that it need not meet the test for a BFOQ in order to justify its gender-based policy, but holds that the BFOQ analysis is different in the prison setting. With that understanding, the difference between *Everson*, on the one hand, and *Tharp* and *Tipler*, on the other, may be more one of semantics than substance. Whether saying the BFOQ analysis does not apply in the prison setting so long as policies are reasonable (*Tharp* and *Tipler*), or instead saying that the BFOQ analysis should be viewed through the lens of deference such that gender-based policies meet the standard so long as they are reasonable (*Everson*), the end result is largely the same—the BFOQ showing that Warren County must make is less demanding than it would be for other employers that adopt policies that expressly rely on gender in making employment decisions. Whether the policy here meets that standard is the issue to which the Court turns next.

### b. Based On The Undisputed Facts, Warren County Has Established The BFOQ Defense.

In addition to claiming that the BFOQ analysis should not apply, Warren County also argues that its facially discriminatory policy of requiring two female corrections officers on each shift meets the requirements for a BFOQ. (Def.'s Reply at 6–8).[2] BFOQs are a narrow exception in Title VII that permit an employer to discriminate based on gender if that employer can show that being of a particular gender is necessary for the job at issue. 42 U.S.C. § 2000e-2(e)(1); *see Reed*, 184 F.3d at 599 ("Thus, under the BFOQ defense, facial gender-based discrimination is permitted if gender is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise.") (citation omitted).

To establish the BFOQ defense, Warren County must satisfy a three-prong test, which requires showings that: (1) it had a "basis in fact" for its belief that gender discrimination is "reasonably necessary"—not merely reasonable or convenient—to the normal operation of its business; (2) the job qualification relates to the essence, or to the central mission, of the employer; and (3) that no reasonable alternatives

---

[2] In its opening brief, Warren County did not attempt to show that its policy met the requirements for a BFOQ, instead relying on its argument that the BFOQ analysis did not apply in the prison context. In her opposition, though, Million argued extensively that the BFOQ analysis does apply, and that Warren County had not satisfied the BFOQ requirements here. Accordingly, in its reply brief, Warren County argued the BFOQ issue as an alternative argument. Typically, a party cannot raise new arguments on reply. *Kuhn v. Washtenaw County*, 709 F.3d 612, 623 (6th Cir. 2013). Here, though, the issue was fully joined by both sides. Moreover, as noted above, any difference between the Eighth Circuit approach (on which Warren County's opening brief relied) and the Sixth Circuit approach in *Everson* is largely a matter of form more than substance. Thus, the argument that the Jail policies comply with the Eighth Circuit test is, for the most part, an argument that those policies also comply with *Everson*. For both of these reasons, the Court concludes that Warren County has placed the BFOQ issue before the Court on summary judgment.

exist to discriminating based on sex. *Everson*, 391 F.3d at 748–49. Here, applying the record evidence and relevant law to this framework and giving due deference to Warren County prison officials, *see id.* at 752, the Court finds Warren County has established these three prongs, and thus the BFOQ defense applies.

### i. *Prong One: Warren County Has Established A Basis In Fact That Its Discriminatory Policy Is Reasonably Necessary To Operate The Jail.*

In *Everson*, the Sixth Circuit explained that an employer can establish the first prong by showing that: "all or substantially all members of one gender would be unable to perform safely and efficiently the duties of the job involved." *Everson*, 391 F.3d at 748 (citations omitted). When considering whether a defendant has carried this burden, as noted above, "courts defer to the judgments of prison administrators". *Id.* at 752.

Here, Warren County asserts that male corrections officers are unable to perform some of the duties necessary to safely and efficiently operate a female-only jail block (C-Pod), such as monitoring female inmates' activities in the showers and bathrooms and performing strip searches on female inmates during intake. As a result, Warren County claims that it must have at least two female corrections officers working each shift. This is true, Warren County contends, for three reasons. (*See* Def.'s Mot. for Summ. J. at 6–7, #148–49). First, requiring that the officers and inmates involved in a strip search are all the same gender is reasonably necessary to protect the privacy of the inmate, and is in fact required by law. *See* Ohio Rev. Code § 2933.32(A)(6). Second, this practice is implemented to manage risk, and is

consistent with correctional best practices and federal policy promoting "zero tolerance" for inmate sexual assaults. *See* Prison Rape Elimination Act, 42 U.S.C. § 15601, *et seq*. Third, Warren County also explains why two officers, as opposed to one, are necessary for such searches: "There is a potential during every strip search that an inmate may become aggressive, disruptive, or combative or a medical or other emergency may arise. The presence of a second corrections officer allows for … verification of what occurs during the search, better documentation, better risk management, and protection of both the officer performing the search and the inmate being searched." (Sims Aff. at ¶ 13, #215).

Upon consideration of the record evidence, proffered justifications, and state and federal law relating to prison protocol, as well as giving due deference to Warren County's prison officials, the Court finds that Warren County has established the first BFOQ prong. The County has a basis in fact for concluding that its gender-based corrections-officer-assignment policy is reasonably necessary to operate the Jail.

### ii. *Prong Two: The Jail's Job Qualification Relates To The Jail's Central Mission Or "Essence."*

Next, Warren County must show that the Jail's policy requiring at least two female corrections officers to always be on duty relates to the Jail's "central mission." *Everson*, 391 F.3d at 753–54; (*see also* Sims Aff. at ¶ 24, #216). Million does not meaningfully dispute whether Warren County can establish this. That is likely because, as Warren County explained, the reason for its gender discrimination policy is to safeguard the inmates' well-being and privacy. The Sixth Circuit itself has uniformly held that "it is beyond cavil that 'privacy' relates to the essence of" the Jail's

business. *Everson*, 391 F.3d at 759; *see Reed*, 184 F.3d at 599. The same is true for the Jail's duty to maintain a safe, secure rehabilitation environment. *See id.*; *see also Reed*, 184 F.3d at 600. For these reasons, Warren County has established that its policy meets the second BFOQ prong.

      **iii.**   **<u>*Prong Three:*</u> *Warren County Has Established That No Reasonable Alternatives Exist To Requiring Two Female Corrections Officer Work During Each Shift.***

Finally, Warren County has established the third BFOQ prong by showing that no reasonable alternatives exist to using the gender-based policies at issue here. Using a gender-neutral assignment process would necessarily result in the possibility that there may be only one, or even no, female corrections officers present during a given shift. For the reasons discussed above, that simply won't work. Under Ohio law, male officers cannot legally perform certain tasks, such as strip searches of female inmates. And state and federal prison best-practices manuals agree that the presence of two officers is appropriate during a strip search. Moreover, the shower-in/out process during intake similarly requires the presence of at least one female officer.

Thus, the only truly gender-neutral alternative to the Jail's gender-based policy of work assignment would be to ensure that no female inmates are strip searched during any shift in which there are not two female officers working, and that no female inmates take showers during the intake process if there is not at least one female officer assigned to the shift. Neither of those strike this Court as reasonable alternatives. Indeed, they appear to impose significant hardships on inmates. Holding those female inmates who require a strip search at intake until a

shift that happens to have two female officers assigned may leave incoming female inmates in the intake holding cell for an indeterminate period of time. And requiring all incoming female inmates to remain in holding to await showering until a female officer happens to be assigned to a given shift under a gender-neutral policy seems problematic at best. Certainly, Million has presented no evidence that would allow this Court to discard the prison administration's penological judgment regarding these issues.

Million suggests one other alternative. She claims that, instead of requiring *two* female corrections officers per shift, the Jail could require *one* per shift, and do any necessary strip searches of female prisoners at intake during the "overlap periods" between shifts. That is, the officers on duty could simply place the female inmate in a holding cell until the beginning of the next female officer's shift. At that time, the arriving female corrections officer and the female corrections officer on the current shift could combine to handle the search. Reducing the required female corrections officers from two to one, Million continues, would eliminate any need for female-only overtime.

There are several problems with this alternative. To start, Ohio's Minimum Standards for Jails (as authorized by Ohio Rev. Code § 5120.10) requires the Jail to implement a written policy addressing "sufficient number of male and female jail staff on-duty and available to perform sensitive functions and procedures as necessary by prisoner gender, and total number of employees required to fill identified posts and functions." Ohio Admin. Code § 5120:1-8-17(D)(1). Thus, Million's plan—in which

some "sensitive functions" could only be performed during shift overlaps—would likely conflict with the applicable prison best practices.

Beyond that, Million's proffered alternative poses additional practical issues that would exacerbate (rather than mitigate) any problems relating to the Jail's current female-only overtime policy. For example, requiring female corrections officers to perform strip searches only during shift overlaps would likely increase the amount of required female corrections officer overtime, as, by definition, any "overlap" means one of the two female corrections officers is presumably working overtime. Implementing Million's alternative would thus transform the frequency of female-only overtime from sparse to regular. And that overtime would continue running for the indeterminate time that it takes the female officers to strip-search the waiting female inmates.

Further, Million's alternative policy fails to account for the fact that, on occasion, corrections officers are unexpectedly absent. When that inevitably occurs, Million's plan would require female inmates to wait in holding cells for up to sixteen hours (i.e., the next shift), or perhaps longer. This would frustrate not only the inmates, but also would burden the next overlapping female corrections officers responsible for processing the growing number of female inmates awaiting intake.

Moreover, not only has Million failed to provide a viable alternative, but it is also worth noting that, on the record here, the gender-based staffing policies at the Jail do not appear to be working any significant harms on female corrections officers, and certainly not on the Plaintiff here. Forced overtime for female corrections officers

occurs only when female corrections officers are unexpectedly absent. Since this is a rare occurrence, the Jail uses female-only overtime sparingly and only as a last resort. Indeed, during her entire ten years as an employee there, Million can substantiate only two occasions on which she was forced to work overtime. Similarly, in terms of bidding for shifts, Million could only remember one six-month period during her tenure in which she did not receive her desired shift. In short, the record evidence shows that the gender-based policy here is, at worst, minimally burdensome.

In sum, Million has failed to create a genuine dispute as to the existence of any reasonable alternatives to the Jail's female-only overtime policy at issue here. Thus, Warren County has established the third BFOQ prong, and so the BFOQ defense applies to the Jail's policy. Accordingly, the Court grants summary judgment to Warren County on Million's sex discrimination claim.

### 2. Retaliation Claims Under Ohio Revised Code § 4112.02(I) And The FMLA.

Million also claims that Warren County retaliated against her after she filed a charge for sex discrimination with the EEOC on May 24, 2013, and because she took FMLA leave in 2015. Million's retaliation claims likewise fail as a matter of law on the record here.

As she concedes, to establish a prima facie case of retaliation, Million must show four elements: (1) that she engaged in protected activity, (2) that her employer knew about the protected activity; (3) that the employer took an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action. (Pl.'s Memo. in Opp. at 19, Doc. 38, #769) (citing

*Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015) (internal citation omitted)). And Million is largely correct that, at the prima facie stage, the burden she faces is "minimal," and requires only "some credible evidence," at least as to the causal relation. (*Id.*, #769) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (internal citation omitted)). Here, though, even considering the minimal burden, Million falls short of establishing a genuine dispute as to the third element (and, accordingly, also fails to establish a genuine dispute as to the fourth element).

In an attempt to meet her burden of establishing an adverse action, Million offers four categories of allegedly retaliatory conduct. Based on the record evidence, though, those four, whether considered singly or collectively, fail to create a triable issue on that element.

According to Million, Warren County retaliated by: (1) imposing enhanced discipline against Million for her failure to appear for an assigned shift; (2) overly disciplining Million for "minor matters," including excessive internet usage; (3) subjecting Million to an administrative investigation in connection with taking sick leave (although she concedes that the investigation did not ultimately result in any disciplinary action); and (4) as a result of the enhanced discipline referred to in item 1 above, imposing enhanced discipline upon Million for later attendance issues, which in turn led to the Jail rejecting her FTO renewal application (and thus losing the enhanced hourly pay that went with that appointment). (Pl.'s Memo. in Opp. at 21–23, #771–73).

In offering these instances, Million does not dispute that she engaged in the conduct that led to the discipline. Rather, she claims the discipline that she received was greater than it otherwise would have been had she not engaged in the protected activity.

Warren County first argues that the fact that she engaged in the underlying activity prevents her from now relying on this discipline as evidence of retaliation. It notes, for example, Sixth Circuit case law observing that an employee having engaged in protected activity does not prevent the employer from continuing to impose their standard workplace rules against that employee.

While that is correct, it misses the point. To be sure, an employer is free to continue applying workplace rules against an employee who has engaged in protected activity, but the employer is not free to apply those rules in a manner that is harsher than it would have been had the employee not engaged in that activity. That is, while "discipline" is not a problem, "over-discipline" would be, and it is "over-discipline" that Million claims here.

The problem for Million, though, is that she has failed to produce (or at least point this Court to) any evidence in the record (as opposed to her own speculation) that creates a genuine dispute as to whether she was in fact over-disciplined. For example, as to the discipline she received for missing her shift (a written reprimand), she claims that "in [her] experience, the practice had been to issue a counselling [sic] for the first occurrence of a minor offense." (Million Decl. at ¶ 27, #800). She provides no examples, though, to substantiate her "experience." That is, she does not provide

affidavits from, or discipline records for, other employees who likewise missed shifts, but were subjected to counseling rather than written warnings. Without some such evidence, all this Court is left with is her bare assertion that she expected that she would have received a lesser sanction. That is not sufficient to create a jury issue. *See e.g., Siegner v. Township of Salem*, 654 F. App'x 223, 230 (6th Cir. 2016) (noting that "mere personal beliefs, conjecture and speculation" are "insufficient to support an inference of retaliation") (citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006)).

Similar problems plague her other proffered examples. On the excessive internet usage front, for example, she claims that she is aware of other employees who used the internet and did not receive write ups, and in her affidavit, she names some such employees. As Warren County noted at oral argument, though, she fails to identify how the internet usage by these other employees compared to that in which she engaged. That is, to establish an inference that the discipline she received was causally related to her protected conduct (as opposed to purely the result of her workplace misconduct), she would need to show that similarly situated employees received a lesser sanction. *See Green v. Cent. Ohio Transit Auth.*, 647 F. App'x. 555, 560 (6th Cir. 2016) ("Causation can be established by indicia of retaliatory conduct, such as evidence that the plaintiff was treated different than similarly situated employees who did not engage in protected activity or evidence that the plaintiff was subjected to closer disciplinary scrutiny after engaging in protected activity."). Here, we do not know how her level of internet usage at work compared to the other

employees she listed. Again, this was a matter that could have been explored during discovery. But the record is now closed, and the Court has no basis for determining whether Million is similarly situated with these other employees as to the "minor matters" (e.g., internet usage) that she raises.

As for the administrative investigation that Warren County undertook in connection with her sick leave, it is not even clear that this is an adverse action. Million concedes that no disciplinary action resulted from the investigation (Def.'s Memo. in Opp. at 22, #772), so the only "adversity" was the investigation itself. At argument, her counsel conceded that her involvement in that investigation was limited to a couple of brief interviews. That seems a thin reed to support a claim of adverse action. *See, e.g., Arnold v. City of Columbus*, 515 F. App'x 524, 531 (6th Cir. 2013) ("First, employer investigations into suspected wrongdoing by employees, standing alone, generally do not constitute adverse employment actions."). But, in any event, the record is again devoid of any evidence establishing that other employees, who likewise took sick leave in similar circumstances, were not also subjected to an administrative investigation.

Finally, Million's claim relating to her rejected FTO renewal application is entirely derivative of her claim regarding enhanced discipline for missing a shift. That is, assuming that prior discipline was permissible, Million concedes that her later attendance-related discipline was appropriate, and that the existence of that discipline would have led to her losing her appointment as an FTO. Thus, this claim

of alleged adverse circumstances fails to create a triable issue for the reasons discussed above in connection with that incident.

In short, even if the burden is "minimal," it is not "non-existent," and Million has failed to provide any record evidence establishing that she received heightened discipline for any of the incidents she listed in her brief. And, absent heightened discipline, she cannot establish her claim of adverse employment actions. Moreover, absent any adverse employment actions, she likewise cannot show any causal relationship between her engagement in protected activity and those (missing) adverse actions. Thus, the employer is entitled to summary judgment on this claim.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Warren County's Motion for Summary Judgment (Doc. 32) and **DISMISSES WITH PREJUDICE** Million's claims. The Court **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

February 19, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**